Filed 12/11/13  Bigfoot Ventures v. NextEngine CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| BIGFOOT VENTURES, LTD., | B242559 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC427246) |
| v. | |
| NEXTENGINE, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Debre K. Weintraub, Judge.  Affirmed.

Davis Law and Thomas P. Davis; Clearspire Law Company, William D. Hagedorn, and Emily E. Terrell for Plaintiff and Appellant.

Rohde & Victoroff and Stephen F. Rohde for Defendant and Respondent.

_____

Appellant Bigfoot Ventures, Ltd. appeals from the judgment entered in favor of respondent NextEngine, Inc. following a jury trial on Bigfoot's claims for breach of contract and NextEngine's cross-claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the California Uniform Commercial Code (UCC). On appeal, Bigfoot argues that the evidence at trial was insufficient to support the jury's special verdict findings in favor of NextEngine and that NextEngine's defenses and cross-claims fail as a matter of law. Bigfoot also asserts that the judgment must be reversed because the jury's special verdict findings were inconsistent and contradictory. For the reasons set forth below, we reject Bigfoot's arguments and affirm the judgment in NextEngine's favor.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Complaint and Cross-Complaint

Bigfoot is a private venture capital company based in Hong Kong whose sole principal is Michael Gleissner. NextEngine is a private technology company based in Los Angeles whose founder and chief executive officer is Mark Knighton. In December 2009, Bigfoot filed this action against NextEngine, alleging causes of action for breach of a 2008 promissory note and breach of a 2008 mutual release agreement. In response, NextEngine filed a cross-complaint against Bigfoot, alleging causes of action for breach of a 2009 oral agreement, breach of the implied covenant of good faith and fair dealing, failure to preserve collateral in violation of the UCC, and improper disposition of collateral in violation of the UCC. The parties' legal claims were tried to a jury in October 2011.

### II. The 2008 Loan Agreement

Founded in 2000, NextEngine is a small start-up company that designs and manufactures three-dimensional laser scanners. NextEngine's two largest shareholders are Knighton and Gleissner, who have a long-standing business relationship. In addition to making a significant capital investment in NextEngine, Gleissner's venture capital

2

company, Bigfoot, made a series of loans to NextEngine between 2002 and 2005. The loans were memorialized by the parties in a 2005 secured promissory note, which was later replaced by a 2007 secured promissory note.

In 2008, after the 2007 note became due and NextEngine was unable to pay it, Gleissner and Knighton agreed to restructure the loan and to replace the 2007 note with a new secured promissory note reflecting the terms of the restructured loan. On June 2, 2008, the parties entered into six written agreements pertaining to the restructured loan: (1) the 2008 Secured Promissory Note, (2) the Mutual Release Agreement, (3) the Assignment and License Agreement, (4) the Share Mortgage Agreement, (5) the Shareholders Agreement, and (6) the Pledge Agreement (collectively, the "2008 Loan Agreement"). Each of the six agreements that comprised the 2008 Loan Agreement included a provision that the agreement could not be altered or amended except by a written document signed by the parties. During the negotiation and drafting of the 2008 Loan Agreement, Bigfoot was represented by its in-house counsel, Jeffrey Berkman, and NextEngine was represented by its outside corporate counsel, Mark Seneca.

Under the 2008 Secured Promissory Note, the principal amount of the restructured loan was 5,535,376 euros. Interest accrued on the principal amount at a rate of 12 percent during the term of the loan. The entire principal and accrued interest were due and payable upon written demand by Bigfoot at any time after June 2, 2009, and had to be repaid in full by NextEngine within 10 calendar days of the written demand. If any portion of the principal or accrued interest was not paid in full within 10 calendar days of Bigfoot's written demand, NextEngine was required to pay interest on the unpaid amount on a monthly basis at a default rate of 15 percent (the "monthly interest payment"). NextEngine's failure to make any payment of principal or interest when due within 5 business days after the applicable due date would constitute an event of default. Upon the occurrence of an event of default, the entire unpaid principal and interest would become immediately due and payable. As a covenant for the promises made in the 2008 Secured Promissory Note, the parties agreed to concurrently enter into the Mutual Release Agreement and the Assignment and License Agreement.

3

Under the Mutual Release Agreement, NextEngine agreed to make certain royalty payments to Bigfoot as additional consideration for the restructured loan. For so long as the 2008 Secured Promissory Note remained outstanding, NextEngine agreed to pay Bigfoot a quarterly fee based on the number of scanners that NextEngine sold during such quarterly period (the "quarterly fee payment"). Each quarterly fee payment was due within 30 days after the end of each calendar quarter, with the first payment due on October 30, 2008. NextEngine's failure to make any quarterly fee payment when due also would constitute an event of default under the 2008 Secured Promissory Note.

As defined in the 2008 Secured Promissory Note, the collateral for the restructured loan was the intellectual property rights held by NextPat Ltd., a Hong Kong company that was formed by Bigfoot and NextEngine solely for the purpose of holding that collateral. Under the Assignment and License Agreement, NextEngine assigned to NextPat all of its rights, title, and interest in NextEngine's intellectual property, including its patents, copyrights, trademarks, and trade secrets, and NextPat granted to NextEngine an exclusive perpetual license to use the intellectual property rights. Notwithstanding an event of default under the restructured loan, the license would remain irrevocable for so long as NextEngine paid in full to Bigfoot (i) each monthly interest payment that was due by the end of each calendar month pursuant to the 2008 Secured Promissory Note and (ii) each quarterly fee payment that was due pursuant to the Mutual Release Agreement. For so long as the license remained irrevocable, NextPat agreed to retain all of the intellectual property rights assigned by NextEngine, and to defer any sale, solicitation for sale, or other disposition or encumbrance of the intellectual property rights. In the event the license became revocable, NextPat could terminate the license upon written notice to NextEngine.

The 2008 Secured Promissory Note was secured by the Share Mortgage Agreement and by a life insurance policy owned by NextEngine and assigned to Bigfoot pursuant to the Pledge Agreement. Under the Share Mortgage Agreement, NextPat had 100 shares of authorized capital of which 51 shares were issued to Bigfoot and 49 shares were issued to NextEngine. As security for the restructured loan, NextEngine agreed to

4

deposit with Bigfoot the share certificates evidencing its 49 shares in NextPat. Upon the occurrence of an event of default under the loan, NextEngine's 49 shares in NextPat automatically would transfer to Bigfoot. However, notwithstanding an event of default, for so long as NextEngine paid in full to Bigfoot (i) each monthly interest payment that was due by the end of each calendar month pursuant to the 2008 Secured Promissory Note and (ii) each quarterly fee payment that was due pursuant to the Mutual Release Agreement, Bigfoot agreed not to sell, solicit for sale, transfer, dispose of, or otherwise encumber any of the shares in NextPat or any of the intellectual property rights held by NextPat. If all payments due under the restructured loan were fully paid by NextEngine, Bigfoot would transfer the 49 mortgaged shares in NextPat back to NextEngine. However, if an event of default continued to occur and NextEngine failed to make any monthly interest payment or any quarterly fee payment when due, Bigfoot could thereafter solicit for sale and sell any part of the NextPat shares or any part of the intellectual property rights.

Under the Shareholders Agreement, if Bigfoot intended to sell any part of the intellectual property rights through a public auction, Bigfoot was required to notify NextEngine of such auction and allow NextEngine a reasonable opportunity to purchase the intellectual property rights at a higher bid. If Bigfoot intended to sell any part of the NextPat shares or the intellectual property rights through a private sale, Bigfoot was required to notify NextEngine of such pending sale and allow NextEngine five business days after receipt of the notice to offer a higher bid. In the event of a permitted sale of any of the NextPat shares or the intellectual property rights, the proceeds from the sale would be applied towards the satisfaction of the 2008 Secured Promissory Note without prejudice to Bigfoot's right to sue for any remaining deficiency.

III.    **January 2009 Oral Agreement to Suspend the Quarterly Fee Payments**

NextEngine made the first quarterly fee payment that was due under the Mutual Release Agreement. In November 2008, after Knighton expressed to Gleissner that it would be difficult for NextEngine to make its future quarterly fee payments given the

global economic crisis, the parties began discussing alternative payment options for NextEngine to meet its royalty obligations. In January 2009, Bigfoot sent NextEngine a written notice that its second quarterly fee payment was due. According to Knighton, he and Gleissner thereafter reached an oral agreement to suspend the quarterly fee payments during the term of the restructured loan and to make those payments due at the same time that the 2008 Secured Promissory Note became due. Following that oral agreement, Bigfoot did not send NextEngine any additional notices requesting payment of the quarterly fees and NextEngine did not make any further quarterly fee payments under the Mutual Release Agreement.

## IV.     May 2009 Oral Agreement to Restructure the 2008 Loan Agreement

During the fall of 2008, Knighton approached Gleissner about the possibility of restructuring the existing loan because of concerns about the impact of the global economic crisis on NextEngine's business. The parties engaged in a series of discussions about NextEngine's proposal to extend the maturity date on the 2008 promissory note in exchange for additional consideration to Bigfoot. According to Knighton, in May 2009, he and Gleissner reached an oral agreement to restructure the loan. Under the oral agreement, the maturity date on the 2008 promissory note would be extended to a "monetization" event for NextEngine, such as a sale, acquisition, or public stock offering of the company. As consideration for extending the maturity date, Gleissner would receive an additional equity interest in NextEngine through a stock restructuring and a new rights offering. On May 12, 2009, Knighton and Gleissner shook hands on the oral agreement during a meeting at the airport. They also agreed to memorialize the terms of their handshake deal in a written agreement to be prepared by their attorneys, but with an understanding that it might take several months to finalize a written agreement given the complexity of the restructured deal.

## V.     July 8, 2009 Demand for Repayment of the Loan

On July 8, 2009, Bigfoot sent NextEngine a written demand for payment of the outstanding principal and accrued interest that were due under the 2008 Secured

Promissory Note. After receiving the written demand, Knighton had a telephone conversation with Bigfoot's counsel, Berkman, who described the demand as a formality while the parties were finalizing their agreement to restructure the loan. Berkman stated that Bigfoot wanted the security of a demand for repayment while the parties worked out the details of the restructuring plan. Over the next few weeks, the parties exchanged several e-mails about the status of the loan. Gleissner expressed concern that the existing loan was due and he had yet to receive any details about the restructured loan. Knighton reassured Gleissner that the parties were making progress on the restructuring plan and the details of the plan would be forthcoming. NextEngine did not make any payment of principal or interest under the 2008 Secured Promissory Note at any time after Bigfoot's written demand.

In early October 2009, Knighton and Gleissner exchanged additional e-mail correspondence about the status of the loan. Gleissner complained that he still had not received a concrete restructuring proposal, and that NextEngine had defaulted on the loan and had not made any of the required monthly interest payments. On October 14, 2009, Knighton sent Gleissner a detailed restructuring plan that included, among other terms, a three-year extension of the maturity date on the 2008 promissory note. Gleissner rejected the restructuring plan sent by Knighton and stated that he was not amendable to any proposal that extended the maturity date beyond a 12-month period. The parties' efforts to further negotiate a restructuring of the loan were unsuccessful, and they ultimately did not execute any written agreement revising or replacing the 2008 Loan Agreement.

## VI.    November 13, 2009 Final Notice of Default

On November 13, 2009, Bigfoot sent NextEngine a final notice of default under the 2008 Secured Promissory Note. In the notice, Bigfoot stated that a public auction of the intellectual property owned by NextPat and licensed to NextEngine was scheduled for December 3, 2009, and that NextEngine had to pay the entire principal and interest that were due under the note to avoid the auction. Bigfoot also requested a list of suggested bidders and NextEngine's shareholders so that they could be notified of the scheduled

auction and be offered an opportunity to participate in the bidding process. In a written response, NextEngine indicated that the contemplated sale of the intellectual property of NextPat was not in the best interests of NextEngine and its shareholders, and that NextEngine remained committed to working with Bigfoot to structure a mutually agreeable solution. NextEngine did not provide the requested list of shareholders or potential bidders.

In November 2009, prior to the auction, Knighton and Gleissner discussed a possible forbearance by Bigfoot in exchange for NextEngine's payment of the interest due under the 2008 Secured Promissory Note. Gleissner indicated that he would consider granting a grace period on the loan if NextEngine paid the total amount of interest that had accrued under the note to date. In response to Knighton's request for details on the proposal, Gleissner explained that he was not willing to extend the maturity date on the note, but might defer collection efforts if NextEngine paid one-half of the total accrued interest immediately and the other half by January 2010. NextEngine did not accept that proposal and did not make any payment of interest under the note. At trial, Knighton claimed that Gleissner's request for payment of the total interest accrued since the inception of the note, rather than the monthly interest payments, failed to comply with the terms of the 2008 Loan Agreement.

## VII.  December 3, 2009 Public Auction of the Intellectual Property

On December 3, 2009, Bigfoot held a public auction of the intellectual property owned by NextPat and licensed to NextEngine. Prior to the auction, Bigfoot did not advertise the sale on any preexisting websites that specialized in intellectual property auctions and did not use the services of a commercial brokerage firm to solicit bids. Instead, Bigfoot created its own website at www.nextengineauction.com to promote the auction and used Gleissner's personal real estate attorney to conduct it. Bigfoot received a single bid of $375,000 for all of NextPat's intellectual property from a friend and business associate of Gleissner, but did not accept that bid or sell any part of the intellectual property rights.

8

Prior to holding the December 3, 2009 public auction, Bigfoot did not take any action to terminate the license held by NextEngine in the intellectual property rights. Following the auction, on December 17, 2009, Bigfoot sent NextEngine a letter stating that NextPat had the right to terminate the license because NextEngine had defaulted under the 2008 Secured Promissory Note and had not made any of the monthly interest payments or quarterly fee payments that were due. The letter further stated that, notwithstanding NextPat's right to terminate the license, NextPat would allow the license to continue provided that NextEngine agreed to transfer to Bigfoot on a weekly basis all payments received in connection with the sale of its scanners; otherwise, the license would be terminated effective December 22, 2009. NextEngine did not accept Bigfoot's payment proposal nor did it discontinue its use of the intellectual property following its receipt of the termination letter. At trial, both Knighton and NextEngine's counsel testified that Bigfoot's actions in conducting an auction of the intellectual property prior to terminating the license did not comply with the terms of the 2008 Loan Agreement.

## VIII.  March 2010 Abandonment of Patents

In mid-December 2009, Bigfoot requested that NextEngine execute a series of documents formally transferring NextEngine's 49 shares in NextPat to Bigfoot pursuant to the 2008 Loan Agreement. Bigfoot's counsel, Berkman, explained to Knighton that the transfer of the NextPat shares had occurred automatically upon NextEngine's default, but Bigfoot nevertheless needed the transfer documents for an annual tax filing in Hong Kong. After conferring with counsel, Knighton agreed to sign the requested documents because he believed that any transfer of the NextPat shares to Bigfoot would not affect NextEngine's underlying license rights in the intellectual property. On December 17, 2009, NextEngine returned the executed documents transferring its 49 percent ownership interest in NextPat to Bigfoot.

In January 2010, Knighton and Berkman exchanged a series of e-mails concerning legal services that needed to be performed to maintain certain patents owned by NextPat. Berkman consented to NextEngine's patent counsel performing the necessary work on

those patents and to Bigfoot paying the associated legal costs. In February 2010, Knighton informed Berkman that additional patents needed to be maintained, but NextEngine's patent firm could not perform such work without a conflict of interest waiver from all parties. On February 11, 2010, Berkman executed a conflict of interest waiver on behalf of Bigfoot and NextPat, which expressly provided that the patent firm solely represented NextEngine in connection with its prosecution and maintenance of the intellectual property rights and did not represent either Bigfoot or NextPat. According to Knighton, Bigfoot also orally represented to NextEngine that it wanted to maintain the intellectual property of NextPat and would pay the associated costs and fees incurred by NextEngine's patent firm.

In or about March 2010, NextEngine's patent counsel advised Berkman that there were two patents that would be deemed abandoned if NextPat did not timely confirm its agreement to pay the costs associated with maintaining those patents. After some delay, Berkman responded that NextPat would not agree to pay any legal expenses related to its patents without a direct client engagement with the patent firm, and that absent such engagement, NextEngine was solely responsible for either paying the expenses or allowing the patents to lapse. Shortly thereafter, two of the patents owned by NextPat were deemed abandoned based on the failure to timely take action to maintain them.

In July 2010, NextEngine's patent counsel sent Bigfoot a list of upcoming patent deadlines and associated legal costs and asked Bigfoot to confirm whether it would pay for such work. In response, Gleissner stated that the patent firm's client was NextEngine and that any payment for services was exclusively a matter between NextEngine and the firm. After Bigfoot refused to pay any of the legal expenses associated with maintaining NextPat's intellectual property, NextEngine began to pay such expenses directly while the parties litigated their dispute.

## IX.    Evidence on Damages

On behalf of Bigfoot, economist Nisha Marie Mody offered expert testimony on the value of NextEngine's 49 percent interest in NextPat as of the default date of July 24,

2009. After considering different methods of valuation, Mody based her valuation of the intellectual property held by NextPat on the single bid of $375,000 that was made at the December 2009 auction, and assumed that such bid, if accepted, would have yielded a maximum rate of return of 50 percent to the purchaser. Using this market-based approach to valuation, Mody opined that the total value of the intellectual property held by NextPat as of the default date was $562,000 and that NextEngine's 49 percent interest in such intellectual property was $275,625.

On behalf of NextEngine, accountant Barbara Luna testified as an expert on commercial reasonableness and damages under the UCC. Luna opined that Bigfoot would not have acted in a commercially reasonable manner if it had represented to NextEngine that it would pay the costs associated with maintaining the intellectual property in its custody and then allowed certain patents to be lost by refusing to honor its commitment. Luna also opined that Bigfoot would not have conducted a commercially reasonable auction of the intellectual property if it created its own website to advertise the sale rather than using established auction websites and then solicited a single bid from friend and former business partner of Gleissner. While Luna admitted that she was not asked to perform a valuation of the intellectual property, she testified that the valuation rendered by Bigfoot's expert was too low given the amount in royalties that Bigfoot was charging NextEngine to license the intellectual property exclusively.

Luna further testified that Bigfoot's actions in declaring NextEngine in default, asserting control over the intellectual property, and then pursuing a major litigation concerning the loan had caused damages to NextEngine by substantially decreasing the stock value of the company. Based on the number of outstanding shares, Luna opined that NextEngine's total stock value was at least $112,197,000 and that Bigfoot's bad faith actions would have caused a 20 percent reduction in the company's stock price, resulting in damages of $22,439,000.

At trial, Knighton testified that NextEngine never made any payment of principal or interest under the 2008 Secured Promissory Note and made only one quarterly fee payment under the Mutual Release Agreement. Knighton also acknowledged in his trial

11

testimony that Bigfoot was "due whatever the agreements say, whatever it accumulates to." As of the start of the October 2011 trial, the total amount of principal and interest that had accrued under the 2008 Secured Promissory Note was approximately $11.5 million, and the total amount of quarterly fee payments that had accrued under the Mutual Release Agreement was approximately $992,550.

## X.     The Jury's Special Verdict

At the close of the evidence, the parties submitted to the jury a special verdict form consisting of 47 questions. The first 22 questions addressed Bigfoot's claims against NextEngine for breach of the 2008 Secured Promissory Note and breach of the Mutual Release Agreement. The remaining 25 questions addressed NextEngine's claims against Bigfoot for breach of the May 2009 oral agreement, breach of the implied covenant of good faith and fair dealing, failure to preserve collateral, and improper disposition of collateral.

On Bigfoot's claim for breach of the 2008 Secured Promissory Note, Question 2 on the special verdict form asked the jury if Bigfoot did all, or substantially all, of the significant things that the 2008 Secured Promissory Note required it to do. The jury answered "No" to Question 2. Based on that answer, the jury was instructed not to respond to any further questions on the essential elements of Bigfoot's claim for breach of the promissory note or to determine the amount due under the note.

On Bigfoot's claim for breach of the Mutual Release Agreement, Question 14 on the special verdict form asked the jury if Bigfoot freely and knowingly gave up its right to require NextEngine to pay quarterly fee payments under the Mutual Release Agreement. The jury answered "Yes" to Question 14. Based on that answer, the jury was not asked to determine the amount of Bigfoot's damages under the Mutual Release Agreement.

Questions 19 through 21 on the special verdict form asked the jury to determine and value the collateral that NextEngine pledged as security under the 2008 Secured Promissory Note. The jury answered that the collateral was the intellectual property

12

rights and that the value of the collateral was $12,555,846.[1]  Question 22 asked the jury to determine the amount of Bigfoot's damages under the 2008 Secured Promissory Note by calculating the difference between the amount due under the note and the value of the collateral.  However, because the jury was not asked to determine the amount due under the note based on its response to Question 2, it calculated Bigfoot's damages under the 2008 Secured Promissory Note as a negative value of "($12,555,846)."

On NextEngine's claim for breach of the May 2009 oral agreement, Question 30 on the special verdict form asked the jury if the contract terms were clear enough so that NextEngine and Bigfoot could understand what each was required to do.  The jury answered "No" to Question 30.  Based on that answer, the jury was instructed not to respond to any further questions on NextEngine's claims for breach of the oral agreement and breach of the implied covenant of good faith and fair dealing.

On NextEngine's claim for failure to preserve collateral, the jury found that Bigfoot was in possession or control of the collateral pledged by NextEngine as security under the 2008 Secured Promissory Note, that Bigfoot did not use reasonable care in the custody and preservation of the collateral, and that NextEngine was harmed by Bigfoot's failure to use reasonable care.  On NextEngine's claim for improper disposition of collateral, the jury further found that Bigfoot had attempted to sell or otherwise dispose of the collateral, that Bigfoot's collection and handling of the collateral was not done in a commercially reasonable manner, and that NextEngine was harmed by Bigfoot's conduct.  Question 43 on the special verdict form asked the jury to determine NextEngine's damages on the failure to preserve collateral claim.  The jury found that NextEngine had a loss of collateral of $6,000 and other damages of $4.5 million for total damages of $4,506,000.

---

[1]     The jury's valuation of the collateral equaled the total amount of principal and interest due under the 2008 Secured Promissory Note, plus the total amount of quarterly fee payments due under the Mutual Release Agreement, as of the date the verdict was rendered.

13

## XI.    The Post-Trial Motions and Judgment

Following the jury's special verdict, Bigfoot filed a motion for a new trial, a motion for judgment notwithstanding the verdict, and a motion to conform the verdict to juror intent.  In support of its post-trial motions, Bigfoot submitted declarations from nine of the 12 jurors, each of whom stated that he or she had voted to award Bigfoot damages of $12,555,846 and NextEngine damages of $4,506,000 in the final jury vote.  Each of the nine jurors also stated that the special verdict form did not appear to include a space for the jury to enter the net award for Bigfoot and that the jurors all voiced their assumption that the trial judge would calculate the net award based on their findings.  At the hearing on the post-trial motions, the trial court struck the juror declarations in their entirety under Evidence Code section 1150 and denied each of Bigfoot's motions.

On May 22, 2012, the trial court entered a judgment in favor of NextEngine and ordered that Bigfoot recover nothing from NextEngine and that NextEngine recover the sum of $4,506,000 from Bigfoot.  Following the entry of the judgment, Bigfoot filed a timely notice of appeal.

## DISCUSSION

## I.    Sufficiency of the Evidence Supporting the Special Verdict

On appeal, Bigfoot challenges the sufficiency of the evidence supporting the jury's special verdict findings in favor of NextEngine.  "When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review. [Citation.]" (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.)  "We must 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. . . .' [Citation.]" (*Ibid*.)  "'[N]either conflicts in the evidence nor '"testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [jury] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'" [Citations.]' [Citation.]" (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)  Therefore, "'when a [verdict]

14

is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [verdict]. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the [jury].'" (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.)

### A. Bigfoot's Claims Against NextEngine

Bigfoot asserted two causes of action against NextEngine: (1) breach of the 2008 Secured Promissory Note, and (2) breach of the Mutual Release Agreement. The jury found in favor of NextEngine on each of these claims. Bigfoot argues that the jury's findings were not supported by substantial evidence because the undisputed evidence at trial established that Bigfoot fully performed under each agreement by making a loan to NextEngine, that NextEngine breached each agreement by failing to make the payments that were required by the agreements, and that Bigfoot never waived its right to receive such payments under the terms of the agreements.

### 1. Breach of the 2008 Secured Promissory Note

On Bigfoot's claim for breach of the 2008 Secured Promissory Note, in response to Question 2 on the special verdict form, the jury found that Bigfoot did not do all, or substantially all, of the significant things that the note required it to do. Based on the express terms of the 2008 Loan Agreement, as well as the testimony at trial, the jury's finding on this claim was supported by substantial evidence.

As a covenant for the promises made in the 2008 Secured Promissory Note, the parties agreed to concurrently enter into the Assignment and License Agreement. Under the Assignment and License Agreement, NextEngine was granted an exclusive and perpetual license to use the intellectual property rights owned by NextPat. Although the license became revocable upon NextEngine's failure to make either the monthly interest payments required by the 2008 Secured Promissory Note or the quarterly fee payments required by the Mutual Release Agreement, the license did not automatically terminate.

15

Rather, the Assignment and License Agreement expressly provided that "[i]n the event the license becomes revocable, NextPat may, upon written notice to NextEngine, terminate the license . . . ." Therefore, until NextPat took action to terminate the license by providing written notice to NextEngine, NextEngine retained its exclusive and perpetual license to use the intellectual property rights. Because NextEngine's license remained exclusive for so long as it was not terminated, neither NextPat nor Bigfoot could sell, offer to sell, or otherwise dispose of or encumber any of the intellectual property rights licensed to NextEngine prior to terminating the license.

The evidence at trial established that, on December 3, 2009, prior to terminating the license, Bigfoot conducted a public auction of all of the intellectual property owned by NextPat. Although the auction ultimately did not result in a sale of any part of the intellectual property or shares of NextPat, Bigfoot did take action to advertise the sale and solicited bids in connection with the sale while NextEngine continued to hold its exclusive and perpetual license to use the intellectual property. Based on such evidence, the jury reasonably could have found that, by failing to terminate the license prior to conducting a public auction of the intellectual property licensed to NextEngine, Bigfoot did not do all of the significant things that the 2008 Secured Promissory Note required it to do.[2]

### 2.    Breach of the Mutual Release Agreement

On Bigfoot's claim for breach of the Mutual Release Agreement, in response to Question 14 on the special verdict form, the jury found that Bigfoot freely and knowingly gave up its right to require NextEngine to pay quarterly fee payments under the Mutual

---

[2]    At trial, NextEngine claimed that Bigfoot also failed to perform its obligations under the 2008 Secured Promissory Note in November 2009 when Gleissner conditioned Bigfoot's forbearance on NextEngine's payment of the total amount of interest accrued under the note rather than the monthly interest payments. Because Bigfoot's failure to terminate the license prior to conducting an auction of the intellectual property provided sufficient evidence to support the jury's findings with respect to the breach of the promissory note claim, we need not consider this issue.

16

Release Agreement. Bigfoot contends that the evidence was insufficient to support a finding of waiver because the Mutual Release Agreement expressly provided that its terms could not be modified, amended, or altered in any way except by written agreement signed by the parties. This claim lacks merit.

The modification of a written contract is governed by Civil Code section 1698, which provides: "(a) A contract in writing may be modified by a contract in writing. [¶] (b) A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties. [¶] (c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration. . . . [¶] (d) Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, rescission of a written contract by an oral agreement, waiver of a provision of a written contract, or oral independent collateral contracts."

Accordingly, notwithstanding a provision in a written contract that precludes oral modification, the parties may, by their words or conduct, waive contractual rights. (*Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1339 ["[l]ike any other contractual terms, timeliness provisions are subject to waiver by the party for whose benefit they are made"]; *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141 ["'the parties may, by their conduct, waive [a no oral modification] provision' where evidence shows that was their intent"].) "'[T]he pivotal issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right.' [Citation.]" (*Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 678.) "'The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right. [Citation.]' [Citation.] Thus, "'California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." [Citation.]' [Citation.]" (*Ibid.*)

Based on Knighton's testimony about a January 2009 oral agreement to suspend the quarterly fee payments owed under the Mutual Release Agreement, the jury's finding

17

of waiver was supported by substantial evidence. Specifically, Knighton testified that, following NextEngine's first quarterly fee payment, the parties orally agreed to "capitalize" all future quarterly fee payments and to make such payments due when the 2008 Secured Promissory Note became due. Knighton further testified that, following such oral agreement, Bigfoot ceased its prior practice of sending notices to NextEngine requesting payment of the quarterly fees and NextEngine ceased making any quarterly fee payments under the Mutual Release Agreement. From such evidence, the jury reasonably could have found that Bigfoot intentionally relinquished its right to receive the quarterly fees under the payment schedule set forth in the Mutual Release Agreement when by, both its words and conduct, Bigfoot agreed to suspend such payments until the 2008 promissory note became due.

### 3. Bigfoot's Damages

Although the jury found in favor of NextEngine on each of Bigfoot's breach of contract claims, the special verdict form nevertheless asked the jury to determine the value of the collateral that NextEngine pledged as security under the 2008 Secured Promissory Note. The jury found that the collateral was the intellectual property rights and that the value of such collateral was $12,555,846. Bigfoot claims that the evidence was insufficient to support the jury's valuation finding because the only evidence offered at trial as to the value of the collateral was the testimony of its expert, Mody, who valued the intellectual property at $562,500. However, the value of the collateral was only relevant to the verdict if the jury had awarded Bigfoot damages for breach of the 2008 Secured Promissory Note, in which case NextEngine could have sought a set-off equal to the value of collateral that secured the note. Because the jury did not award any damages to Bigfoot on its breach of the promissory note claim, the jury's finding as to the value of the collateral did not have any impact on the judgment.[3]

---

[3] Bigfoot asserts that, even if the jury had awarded it damages on the breach of the promissory note claim, NextEngine would not have been entitled to a set-off based on the value of the collateral because NextEngine continued to use the collateral after it

18

In challenging the sufficiency of the evidence supporting the jury's findings on each of its breach of contract claims, Bigfoot also cites to the nine juror declarations that it submitted with its post-trial motions, each of which stated that the jury intended to award Bigfoot damages of $12,555,846 and NextEngine damages of $4,506,000. However, in denying Bigfoot's post-trial motions, the trial court ruled that the declarations were inadmissible under Evidence Code section 1150, and Bigfoot does not challenge the trial court's evidentiary ruling on appeal. Even assuming the declarations were admissible, none of them stated that the jurors incorrectly answered any question on the verdict form by checking "Yes" when they meant "No," or vice versa. Instead, based on the jury's answers to Question 2 (whether Bigfoot did the significant things it was required to do under the 2008 Secured Promissory Note) and Question 14 (whether Bigfoot waived its right to receive quarterly fee payments under the Mutual Release Agreement), the jury found that Bigfoot had failed to establish the essential elements of each breach of contract claim alleged against NextEngine. Therefore, even if the jury had intended to award a certain amount of damages to Bigfoot, its special verdict findings on Questions 2 and 14, which, as discussed above, were supported by substantial evidence, precluded Bigfoot from recovering any damages under its claims as a matter of law.

## B. NextEngine's Claims Against Bigfoot

NextEngine asserted four causes of action against Bigfoot: (1) breach of a May 2009 oral agreement, (2) breach of the implied covenant of good faith and fair dealing, (3) failure to preserve collateral in violation of the UCC, and (4) improper disposition of collateral in violation of the UCC. The jury found in favor in of NextEngine on the claims for failure to preserve collateral and improper disposition of collateral. Bigfoot argues that there was insufficient evidence to support jury's findings on each of these claims because the evidence at trial established that Bigfoot did not have possession or

---

defaulted on the loan. Given that the NextEngine was not awarded any set-off based on the value of the collateral in the judgment, we need not address this issue.

19

control of the intellectual property, which instead was controlled exclusively by NextEngine pursuant to its license. Bigfoot also asserts that each of these claims fails as a matter of law because neither the UCC nor the parties' contract imposed a legal duty of care on Bigfoot with respect to its handling of the intellectual property rights.

Under Division 9 of the UCC, following a default by the debtor, "[a] secured party in possession of collateral or control of collateral . . . has the rights and duties provided in Section 9207." (Cal. U. Com. Code, § 9601, subd. (b).)[4] Section 9207 states that "a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession." (§ 9207, subd. (a).) Sections 9609 and 9610 provide that, after default, a secured party may "[t]ake possession of the collateral" and "may sell, lease, license, or otherwise dispose of any or all of the collateral," subject to the requirement that "every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." (§§ 9609, subd. (a), 9610, subds. (a), (b).) Under section 9625, a secured party generally "is liable for damages in the amount of any loss caused by a failure to comply with this division," including sections 9207, 9609, and 9610. (§ 9625, subd. (b).)

### 1. Failure to Preserve Collateral

On NextEngine's claim against Bigfoot for failure to preserve collateral, the jury found that Bigfoot was in possession or control of the collateral pledged by NextEngine as security under the 2008 Secured Promissory Note, that Bigfoot did not use reasonable care in the custody and preservation of the collateral, and that NextEngine was harmed by Bigfoot's failure to use reasonable care. Bigfoot contends that the evidence was insufficient to support the jury's finding that it was in possession or control of the intellectual property rights because such rights had been exclusively licensed to NextEngine. Although it is true that NextEngine retained an exclusive license to use the

---

**4** Unless otherwise stated, all further statutory references are to the California Uniform Commercial Code.

20

intellectual property notwithstanding an event of default, the jury reasonably could have found that Bigfoot took affirmative steps to exercise control over the intellectual property following NextEngine's default on the loan. In particular, the evidence showed that, after sending NextEngine a final notice of default, Bigfoot conducted a public auction of the intellectual property owned by NextPat and licensed to NextEngine. Following the auction, Bigfoot sent NextEngine a letter stating that NextPat intended to terminate the license unless NextEngine agreed to make certain weekly payments to Bigfoot. While it appears that NextEngine continued using the intellectual property after rejecting Bigfoot's proposal, the license remained subject to the termination rights held by NextPat, which, as of the default date, was under the sole ownership of Bigfoot.

Bigfoot also claims that, as a matter of law, the jury could not have found that NextEngine was harmed by Bigfoot's failure to preserve the collateral because Bigfoot had no legal duty to maintain the intellectual property while it was being licensed to NextEngine. However, because there was substantial evidence to support the finding that Bigfoot asserted control over the intellectual property following NextEngine's default, it had a duty to use reasonable care to preserve such collateral under section 9207. The jury heard evidence that Bigfoot initially agreed to pay the legal costs associated with maintaining the patents that were owned by NextPat and licensed to NextEngine, and accordingly executed a conflict of interest waiver to allow NextEngine's patent counsel to perform the necessary legal work. The jury also heard evidence that, shortly before two patents were set to lapse, Bigfoot abruptly reneged on its agreement and refused to pay any of the costs required to maintain them, resulting in the loss of both patents. Based on that evidence, the jury reasonably could have found that Bigfoot breached its duty of care to preserve the collateral under the UCC and caused harm to NextEngine.

### 2. Improper Disposition of Collateral

On NextEngine's claim against Bigfoot for improper disposition of collateral, the jury found that Bigfoot was in possession or control of the collateral pledged by NextEngine as security under the 2008 Secured Promissory Note, that Bigfoot attempted

21

to sell or otherwise dispose of the collateral, that Bigfoot's collection and handling of the collateral was not done in a commercially reasonable manner, and that NextEngine was harmed by Bigfoot's conduct. Bigfoot asserts that, as a matter of law, it could not have breached any duty related to its attempted sale of the intellectual property because it was permitted by both the UCC and the parties' contract to dispose of the collateral once NextEngine failed to make the payments due under the loan.

However, as previously discussed, Bigfoot's right to sell, offer to sell, or otherwise dispose of the intellectual property owned by NextPat was subject to the exclusive license held by NextEngine. Bigfoot's actions in conducting a public auction of the intellectual property while NextEngine continued to hold an exclusive license for such use did not comply with the terms of the parties' agreement. Additionally, there was evidence that Bigfoot failed to conduct the auction in a commercially reasonable manner when it created its own website to promote the sale rather than advertise it on established auction websites, and used Gleissner's personal real estate attorney to solicit bids for the auction rather than engage a commercial brokerage firm. There was also evidence that Bigfoot's actions in asserting control over the intellectual property caused damage to NextEngine's stock value. Based on this record, the jury's findings that Bigfoot did not act in a commercially reasonable manner in its attempted sale of the collateral were supported by substantial evidence.

## II.    Alleged Inconsistencies in the Special Verdict

Bigfoot also argues that the judgment must be reversed because the jury's special verdict findings were inconsistent and contradictory. "A special verdict is inconsistent if there is no possibility of reconciling its  findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency. [Citations.]" (*Singh v. Southland Stone, U.S.A., Inc.* (2010)

22

186 Cal.App.4th 338, 357-358, fn. omitted.)  Where a verdict is fatally inconsistent, no objection is required in the trial court to preserve the issue for review on appeal.  (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530.)

An appellate court reviews a special verdict de novo to determine whether its findings are inconsistent.  (*Singh v. Southland Stone, U.S.A., Inc.*, *supra*, 186 Cal.App.4th at p. 358; *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.)  "A court reviewing a special verdict does not infer findings in favor of the prevailing party [citation], and there is no presumption in favor of upholding a special verdict when the inconsistency is between two questions in a special verdict.  [Citation.]  'Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law.'  [Citations.]"  (*Zagami, Inc. v. James A. Crone, Inc.*, *supra*, at p. 1092.)  "The proper remedy for an inconsistent special verdict is a new trial.  [Citation.]"  (*Singh v. Southland Stone, U.S.A., Inc.*, *supra*, at p. 358.)

### A.  Bigfoot's Breach of the Promissory Note Claim vs. NextEngine's Breach of the Oral Agreement Claim

Bigfoot contends that the jury's special verdict finding that there was no oral agreement to modify the 2008 Secured Promissory Note is inconsistent with its finding that no amount was due under the note.  According to Bigfoot, NextEngine's assertion that Bigfoot was not entitled to recover any money under the 2008 Secured Promissory Note was entirely predicated on its argument that the 2008 note had been revised by a 2009 oral agreement to extend the maturity date on the note, and thus, NextEngine was not in default when it failed to pay the note following Bigfoot's demand.  Bigfoot reasons that the jury's finding that the parties did not orally agree to extend the maturity date on the note could only mean that NextEngine was in default and that Bigfoot was owed the full amount of principal and interest due under the note.

The jury's findings on the parties' respective breach of contract claims did not result in an inconsistent verdict.  On NextEngine's claim for breach of the 2009 oral agreement, the jury found that the parties did not enter into an enforceable oral agreement

23

to replace or revise the 2008 Secured Promissory Note because the contract terms were not clear enough for the parties to understand what each was required to do. Based on that finding, Bigfoot's loan to NextEngine was governed by the terms of the 2008 promissory note. On Bigfoot's claim for breach of the 2008 promissory note, the jury found that Bigfoot was not entitled to recover damages for breach of the note because Bigfoot did not do all, or substantially all, of the significant things that the note required it to do. As previously discussed, this finding was supported by substantial evidence that Bigfoot did not terminate NextEngine's exclusive license to use the intellectual property prior to auctioning the property, as required by the terms of the note. Because the jury found that Bigfoot failed to perform all of its obligations under the 2008 promissory note, the jury never reached the question of whether NextEngine defaulted under the note by failing to repay the loan. Accordingly, there was no inconsistency in the jury's responses because its finding that the parties did not modify the 2008 promissory note by a subsequent oral agreement was independent of its finding that Bigfoot did not comply with the terms set forth in the written agreement.

### B. The Value of the Collateral vs. Damages for the Failure to Preserve the Collateral

Bigfoot next asserts that the jury's finding that the value of the collateral securing the loan was $12,555,846 contradicted its finding that Bigfoot's failure to preserve such collateral caused NextEngine damages of $4,506,000. In particular, Bigfoot argues that, to the extent its alleged mishandling of the intellectual property resulted in a loss of $4,506,000 to NextEngine, the value of the intellectual property should have been equal to the amount of such loss, rather than the amount sought by Bigfoot as damages for its breach of contract claims. However, as NextEngine correctly points out, the value of the collateral securing a loan is not an award of damages for a violation of the UCC.

Under section 9625 of the UCC, a debtor generally may recover damages for any loss caused by a secured party's non-compliance with any of the provisions of Division 9, including the provisions governing the secured party's duty to use reasonable care in the

24

collection, preservation, and disposition of the collateral. (§ 9625, subds. (b), (c).) A loss caused by a failure to comply with these provisions "may include loss resulting from the debtor's inability to obtain, or increased costs of, alternative financing." (§ 9265, subd. (b).) In determining NextEngine's damages on its failure to preserve collateral claim, the jury was not asked to assess the value of the collateral securing the promissory note. Rather, the jury was asked to assess the amount of loss suffered by NextEngine as a result of Bigfoot's failure to use reasonable care in its handling of the collateral. As discussed, there was evidence that Bigfoot did not use reasonable care to preserve two of the patents that were licensed to NextEngine, which resulted in both patents being lost. There was also evidence that Bigfoot's efforts to assert control over the intellectual property created a cloud over NextEngine's right to continue using the intellectual property to develop and sell its products, which in turn led to a diminution in the stock value of the company. The jury's finding as to the damages caused by Bigfoot's mishandling of the intellectual property was therefore separate and distinct from its finding as to the value of the intellectual property pledged as security for the loan.

### C. Damages for Breach of the 2008 Promissory Note vs. Damages for the Failure to Preserve the Collateral

Bigfoot also claims that there was a fatal inconsistency between the jury's finding that Bigfoot was not entitled to recover damages for breach of the 2008 Secured Promissory Note and its finding that NextEngine was entitled to recover damages for Bigfoot's failure to preserve the collateral that secured the note. In support of this claim, Bigfoot points to section 9625, subdivision (d), which provides that a debtor whose deficiency is eliminated or reduced under section 9626 may not recover damages for non-compliance with the UCC provisions governing the collection, enforcement, disposition, or acceptance of the collateral. Bigfoot reasons that, because NextEngine's deficiency under the 2008 promissory note was eliminated by the jury's finding that Bigfoot was due nothing under the note, NextEngine could not recover any additional damages based on Bigfoot's failure to exercise reasonable care in its handling of the collateral.

Contrary to Bigfoot's claim, however, the jury's special verdict findings did not eliminate any alleged deficiency under section 9626. Section 9626 provides that, where a secured party in a commercial transaction sues to recover a deficiency but fails to prove that it complied with the UCC provisions relating to collection, enforcement, disposition, or acceptance of the collateral, the secured party is limited to recovering the difference between the amount of the secured obligation and the greater of the actual proceeds of the disposition or the proceeds that would have been realized had the secured party complied with the relevant UCC provisions. (§ 9626, subd. (a)(3).) The statute further provides that, unless the secured party proves that the amount of proceeds that would have been realized is less than the amount of the secured obligation, the secured party may not recover any deficiency. (§ 9626, subd. (a)(4).) In this case, however, Bigfoot did not sell or otherwise dispose of the collateral securing the loan and the jury did not make any award reducing or eliminating any deficiency owed by NextEngine. Indeed, because the jury found that Bigfoot did not perform all of its obligations under the terms of the 2008 promissory note, it made no further findings regarding Bigfoot's right to recover any amount due under the note. In particular, the jury never reached the special verdict questions regarding whether NextEngine had performed all of its obligations, and if not, what amount of outstanding principal and interest were due and owing to Bigfoot.

At the heart of the parties' arguments on appeal is a dispute about the impact of the jury's special verdict findings on NextEngine's payment obligations under the 2008 Loan Agreement. Bigfoot argues that the jury's verdict effectively precludes it from ever recovering from NextEngine the amount that indisputably is due under the terms of the 2008 promissory note. NextEngine, on the other hand, asserts that the jury's verdict does not limit Bigfoot's right to repayment of the loan because the jury made no finding as to the amount due under the note; it merely found that Bigfoot was not entitled to recover damages based on an alleged breach of the note by NextEngine. We agree with NextEngine that the jury's special verdict findings did not have the effect of eliminating NextEngine's payment obligations under the 2008 Secured Promissory Note. As NextEngine has conceded on appeal, the jury's verdict did not change the amounts due

under the note or otherwise alter NextEngine's obligation to pay the note according to its terms. Bigfoot accordingly is not precluded from seeking to enforce its right to recover the payments owed by NextEngine under the 2008 Loan Agreement, provided however, that any future enforcement action taken by Bigfoot must comply with the terms of the parties' agreement and the relevant provisions of the UCC.[5]

## DISPOSITION

The judgment is affirmed. NextEngine shall recover its costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


WOODS, J.

---

[5]    In its respondent's brief, NextEngine summarily requests its attorney's fees on appeal. However, because NextEngine advances no argument or analysis in support of its request for attorney's fees, we deny that request. (*Banning v. Newdow* (2004) 119 Cal.App.4th 438, 458-459.)

27